OPINION
{¶ 1} Appellant, Tyreal Kidd ("Mr. Kidd"), appeals from the August 8, 2006 judgment entry of the Portage County Court of Common Pleas, which sentenced him to a definite term of imprisonment of four years following his conviction by jury on one count of felonious assault. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History
 {¶ 3} Mr. Kidd's conviction stems from a bar fight which occurred outside of the Windham Tavern, in Windham, Ohio, on the night of January 23, 2006. Mr. Kidd and *Page 2 
his girlfriend, Jennifer Richmond ("Ms. Richmond"), along with Richmond's brother, Michael Campana ("Mr. Campana"), walked to the Windham Tavern at approximately 10:30 p.m. after drinking several alcoholic beverages, first at Ms. Richmond's home, and then at one of her girlfriend's down the street. While they were at Ms. Richmond's house, Mr. Campana showed them a credit card that he allegedly found in a dumpster.
 {¶ 4} Mr. Campana purchased the third round of drinks on the stolen credit card, and the bartender, Cheree Kastor ("Ms. Kastor"), allowed him to make several cash advances on the card throughout the evening. Mr. Kidd became upset with Mr. Campana, and it is at this point in the story that there is conflicting testimony as to the events that followed.
 {¶ 5} The state presented evidence and testimony of nine witnesses: the victim, Ronald Sorace ("Mr. Sorace"), Cheree Kastor, Jennifer Richmond, Karen Cipriano, Scott Klem, Patrick Germano, Dr. Dennis Haver, Patrolman Jason Latman, and Officer Donald Cox; as well as Mr. Sorace's medical records and pictures of the knife, blood on the ground at the scene of the fight, Mr. Kidd, after being apprehended, and Mr. Sorace, at the hospital taken the following day; in addition to a videotape of the bar inside prior to the fight.
 {¶ 6} According to the state's witnesses, Mr. Kidd was involved in a noisy argument with Ms. Richmond. Ms. Richmond, who was a frequent patron, called Ms. Kastor over to sit with them because Mr. Kidd was upsetting her. Ms. Kastor then asked Mr. Kidd to leave, which he did. However, Mr. Kidd returned even more upset a short while later, and this time became involved in a verbal altercation with another patron, Scott Klem ("Mr. Klem"), who was at the bar with his friend, Patrick Germano ("Mr. Germano"). Mr. Sorace, the victim in this case and also the brother of Ms. *Page 3 
Kastor's boyfriend, approached Mr. Kidd and asked him to leave. Ms. Richmond and Mr. Kidd then left the bar. Mr. Sorace followed them out since Ms. Kastor had requested that he get some compact discs out of his car. Ms. Kastor followed him out to tell him to get a disc from her car as well.
 {¶ 7} Mr. Sorace testified that when he came out of the bar he saw Ms. Richmond and Mr. Kidd still standing outside of the bar arguing. The next thing Mr. Sorace knew, Mr. Kidd jumped him from behind. They both tripped and fell over Ms. Kastor's car. Mr. Sorace felt himself getting hit repeatedly in the side, and he began to have trouble breathing. Ms. Kastor, who saw Mr. Kidd swinging at Mr. Sorace, ran inside to hit the panic button to call the police. Mr. Germano ran outside to see what was occurring, and saw Mr. Sorace on top of Mr. Kidd between Ms. Kastor's car and the wall. Mr. Germano was acquainted with Mr. Sorace as he was a friend of Mr. Klem's brother. Mr. Klem was also standing in the background outside of the tavern witnessing the fight.
 {¶ 8} Mr. Germano saw Mr. Klem grab Mr. Sorace and take him into the bar. It was then that Mr. Klem realized Mr. Sorace, who was bleeding profusely, had been stabbed multiple times. He called out to Ms. Kastor to call the police, and ran back outside to detain Mr. Kidd. As he ran back outside, he called out to Mr. Germano that Mr. Sorace had been stabbed. Mr. Germano, Mr. Klem, and three other individuals ran after Mr. Kidd, who was walking backwards down the street, watching their approach. The men tackled Mr. Kidd, and Mr. Kidd's knife and cell phone fell onto the street. Mr. Kidd was then dragged to the side of the street and Mr. Germano grabbed the knife and cell phone and ran them into the bar to Ms. Kastor, who gave them to the police when they responded to the call. *Page 4 
 {¶ 9} Mr. Klem testified that Ms. Richmond was never involved in the altercation; however, Mr. Germano testified that when he came back from giving Ms. Kastor Mr. Kidd's knife and cell phone, Ms. Richmond and Mr. Campana were kicking at Mr. Klem, who was in turn kicking at Mr. Kidd, trying to get him free from Mr. Klem's blows. There is disputed testimony as to whether Ms. Richmond herself was involved in stabbing Mr. Sorace, and whether she was involved in this subsequent altercation. However, Ms. Richmond was charged and pled guilty to an aggravated assault charge resulting from the incident. Either before or shortly after the police arrived on the scene, Mr. Sorace's two brothers also arrived on scene, presumably because someone had notified them that he was involved in an argument or that he was hurt.
 {¶ 10} At that point, at approximately 12:43 a.m., Patrolman Jason Latman ("Officer Latman") and Officer Donald L. Cox ("Officer Cox"), both from the Windham Police Department, arrived on the scene. When they pulled up, several people were standing outside screaming, Mr. Sorace was lying in the parking lot bleeding, and Mr. Kidd, who was beaten, with his eyes swollen, and also covered in blood as well as mud, was walking away from the scene. People were yelling to the police that Mr. Kidd had stabbed Mr. Sorace. The officers drew their weapons and ordered Mr. Kidd to the ground. Officer Cox then handcuffed him and put him in the back of the police cruiser. Ms. Richmond and Mr. Campana were also detained and placed in the cruiser. Officer Latman attended to Mr. Sorace and then went into the bar where Ms. Kastor gave him Mr. Kidd's knife and cell phone. The officers also attended to Mr. Klem, who was assaulted by another individual.
 {¶ 11} The officers obtained statements from Mr. Klem, Mr. Germano, Ms. Kastor, and they interviewed Mr. Kidd, who admitted that he stabbed Mr. Sorace, albeit *Page 5 
in self-defense. Mr. Klem, in his statement, never mentioned the verbal altercation that occurred when Kidd returned to the bar for the second time, nor did Ms. Kastor's written statement report that she kicked Mr. Kidd out of the bar and asked him to leave. Both of their trial testimonies contained these facts.
 {¶ 12} The defense presented a much different version of events. Testifying for the defense was Stacey Brown, the owner of the Windham tavern; several of Kidd's friends, Duane Watkins, Amanda Jope, Carl Brown, and Chris Bird; as well as Dr. Stephen Battles, the physician for the Portage County Jail; and Dr. Bunia, Kidd's physician.
 {¶ 13} Mr. Kidd testified that he was not involved in an altercation with Ms. Richmond; rather, he was upset with Mr. Campana for buying them drinks with the stolen credit card. He became upset and left the bar. He came back to get Ms. Richmond, and it was then that Mr. Klem approached him and began to taunt him. He left for the second time with Ms. Richmond, and about five or six people followed him outside of the bar. He argued with the crowd and began to walk away. When he was about thirty to fifty feet away, he was blind-sided by Mr. Sorace, who he later identified from pictures of Mr. Sorace taken at the hospital on the day following the incident. They began fighting, and Mr. Sorace started to kick him multiple times. When he was kicked in the eye, he began to panic. Mr. Kidd does not remember pulling out the knife, but he did indeed do so, and admitted to stabbing Mr. Sorace three or four times. Mr. Sorace, however, testified that he had been stabbed thirteen times, and Dr. Haver, the ER physician from Robinson Memorial Hospital who attended to Mr. Sorace on the night of the incident, testified that he had been stabbed multiple times. *Page 6 
 {¶ 14} Mr. Kidd was standing on the street, holding his eye, when Mr. Klem came out of the bar, yelling at him. Mr. Kidd began walking backwards as he watched Mr. Klem, Mr. Germano, and four others rush at him and throw him to the ground. They began to beat him until they heard the police approaching. He was subsequently apprehended and arrested when they arrived on the scene.
 {¶ 15} Mr. Kidd denies that Ms. Richmond had any involvement in the stabbing or in the fight that occurred after. Ms. Richmond remembers at least seven people kicking Mr. Kidd during the second altercation. She testified for the state and admitted that she had accepted a plea bargain in this case, although she was adamant that she had not stabbed anyone and was not guilty. Ms. Richmond did not recall Mr. Kastor asking Mr. Kidd to leave the bar, and denies arguing with Mr. Kidd at the bar. Instead, she corroborated Mr. Kidd's testimony somewhat in that she believes that Mr. Klem, who had been talking with Mr. Campana, began the verbal altercation with Mr. Kidd, prior to the first time he left the bar. She testified that the fight began when somebody tried to lunge at her, and that Mr. Kidd started the physical fight.
 {¶ 16} Mr. Kidd was indicted by grand jury for the charge of felonious assault, a felony of the second degree, in violation of R.C. 2903.11, on January 26, 2006. At the arraignment hearing on January 30, 2006, Mr. Kidd entered a plea of not guilty, bond was set in the amount of $200,000, and Mr. Kidd was placed on house arrest. On March 1, 2006, Mr. Kidd filed an ex parte motion for funds for investigative expenses and an affidavit of indigency. The court addressed the issue at a hearing on April 14, 2006. It was determined that before proceeding with a full indigency hearing, Mr. Kidd would contact the public defender's office to seek investigative assistance. The court then held a hearing on the motion on May 1, 2006, after he was unable to obtain such *Page 7 
assistance, and in a judgment entry filed May 3, 2006, the court overruled the motion, finding that Mr. Kidd was capable of employment. The court also modified his house arrest to allow him to seek employment while awaiting trial. Mr. Kidd filed a motion to reconsider funds for investigative expenses on May 17, 2006.
 {¶ 17} The case proceeded to jury trial on June 20, 21, and 22 of 2006. The jury returned a verdict of guilty on the felonious assault charge and the matter was referred to the probation department for a presentence investigation. Mr. Kidd filed a motion for new trial on July 6, 2006. The sentencing hearing was held on August 7, 2006, and on August 8, 2006, the court issued a judgment entry, which sentenced Mr. Kidd to a four year term of imprisonment, giving him credit for time served, ordered him to pay restitution of up to $30,000 within thirty-six months of his release from prison, and a fine of $500, as well as notifying him that he would be subject to post-release control upon his release. Mr. Kidd handwrote a letter to the court asking for a reconsideration of his sentence on August 29, 2006. The court construed this as a motion for reconsideration and denied it on the same day. Mr. Kidd then filed this appeal on August 31, 2006, as well as a motion to stay the execution of his sentence, pending the outcome of this appeal.
 {¶ 18} A hearing on Mr. Kidd's motion for new trial and motion for stay was held on December 7, 2006, and in a judgment entry issued on December 11, 2006, the court overruled both, finding them not well-taken.
 {¶ 19} Mr. Kidd now raises the following four assignments of error:
 {¶ 20} "[1.] The trial [sic] erred in ruling denying [sic] Kidd indigency status.
 {¶ 21} "[2.] The trial [sic] erred in failing to give the appellant's requested jury instructions on his burden of proof and his character evidence. *Page 8 
 {¶ 22} "[3.] The trial court erred in excluding evidence concerning the effects of the victim's excessive alcohol and opiates consumption on the night of the incident.
 {¶ 23} "[4.] Certain acts of the prosecutor result in reversible error, rendered the appellant's trial fundamentally unfair and acted to produced result [sic] that is constitutionally unreliable."
 {¶ 24} Indigency Status
 {¶ 25} In his first assignment of error Mr. Kidd contends that the trial court's determination that he was not indigent deprived him of a fair trial because he was deprived of adequate pretrial investigative services and an opportunity to seek funds for expert witnesses.
 {¶ 26} "The determination of indigency will not be reversed absent an abuse of discretion." State v. Sweitzer (July 14, 2000), 11th Dist. No. 98-T-0203, 2000 Ohio App. LEXIS 3204, 17, citing State v. Weaver (1988),38 Ohio St. 3d 160, 161. "The term `abuse of discretion' implies more than error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Pasqualone, (Mar. 31, 1999), 11th Dist. No. 97-A-0034, 1999 Ohio App. LEXIS 1429, 12.
 {¶ 27} Specifically, Mr. Kidd argues that because he was not declared indigent, he was deprived of state-funded expert witnesses who were crucial to his case and, further, that he was deprived of investigative services. We cannot say that the trial court abused its discretion in this case since a review of the record reveals that the court held an indigency hearing, and based upon a lack of evidence that Mr. Kidd was indigent, ruled accordingly. Furthermore, the court was careful to provide Mr. Kidd with multiple hearings as the case progressed to trial in order to determine whether he was, in fact, indigent and in need of state assistance. *Page 9 
 {¶ 28} Mr. Kidd argues that the court wrongly concluded that he was not indigent because he had private counsel who was retained by his mother. The fact that one has secured private counsel does not "preclude him or her from being declared indigent." Sweitzer at 18, citingPasqualone at 12. Indeed, "one's status as indigent or non-indigent does not necessarily have to stay the same throughout a criminal proceeding." Id. at 17. Rather, "[t]hat status can change over time."Sweitzer at 18. Recognizing this, the issue of Mr. Kidd's status as indigent was addressed in three different hearings as the case proceeded to trial.
 {¶ 29} The matter was first discussed at the March 17, 2006 hearing on Mr. Kidd's motion to compel, motion to continue, and motion for funds hearing. On the issue of an investigator, the court and Mr. Kidd's counsel agreed that Mr. Kidd would contact the public defender's office for assistance. The court then advised Mr. Kidd's counsel that if he was not successful he should so advise the court so that an indigency hearing could be held. Mr. Kidd also requested a modification of his house arrest so that he could obtain employment while awaiting trial in order to be able to fund his defense. The court granted this request and instructed Mr. Kidd to contact the court upon obtaining a job interview for court approval of temporary release from his house arrest to attend the interview.
 {¶ 30} On April 14, 2006, a hearing was held on Mr. Kidd's motion for investigative expenses. The court inquired as to whether the public defender's office had been contacted, and the matter was deferred until contact was made.
 {¶ 31} Subsequently, a hearing was held on May 1, 2006, on Mr. Kidd's motion for state-funded expert witnesses. Since the hearing of April 14, the public defender's office denied Mr. Kidd's request for investigative assistance since they determined that *Page 10 
he was not indigent. At the hearing, Mr. Kidd testified that he was a mortgage signer; that since he was arrested he has not conducted any mortgage signings or has had any form of employment or income; and that he was currently using his credit card as his sole means of support. At the time of the hearing, Mr. Kidd also owned a car, was renting an apartment, had some college education, and most importantly, affirmatively told the court that he had the ability to find a job, but that his electronic monitoring was the obstacle preventing him from obtaining employment.
 {¶ 32} The court ultimately determined that Mr. Kidd had assets and was capable of producing income. Moreover, the court ensured that Mr. Kidd would have the opportunity to do so by allowing him to search for jobs while on house arrest under specific conditions.
 {¶ 33} Claimed Need for Expert Witnesses
 {¶ 34} Mr. Kidd argues that the court's determination prevented him from obtaining crucial expert witnesses that were needed for his theory of self-defense. Specifically, Mr. Kidd sought to obtain four state-funded experts, a videotape expert to refute the testimony of the states' witnesses; an ophthalmologist to testify that Mr. Kidd's skull injury was consistent with self-defense; a toxicologist to support the theory that the combined effect of alcohol and opiates in Mr. Sorace's bloodstream could have caused Mr. Sorace to continue fighting after being stabbed because he felt no pain; and a diabetologist to support the theory that hypoglycemia may be the reason why Mr. Kidd could explain only three or four stab wounds of the multiple stab wounds found on the victim.
 {¶ 35} We note that even if Mr. Kidd had proved he was indigent and in need of state-funds, he would still have to prove that he had a need for these expert witnesses, *Page 11 
which he failed to do. That, is, "there must be a showing of `more than a mere possibility of assistance from an expert.'" State v. Balaban
(Sept. 21, 2001), 11th Dist. No. 98-L-215, 2001 Ohio App. LEXIS 4292, 14, quoting State v. Broom (1988), 40 Ohio St. 3d 277, 283. Notably absent from the hearings on Mr. Kidd's indigent status is testimony as to how these experts would have provided more than merely a possibility of assistance since the information Mr. Kidd sought to elicit from these witnesses was presented to the jury through other testimony and evidence.
 {¶ 36} At the December 7, 2006 hearing on Mr. Kidd's motion for new trial, his counsel relayed to the court that although Mr. Kidd had retained an investigator with funds from a cash advance from a credit card, the investigator was inadequate and did not perform according to expectation, and further, that Mr. Kidd's physician, Dr. Brunia, was an unexpectedly adverse witness. Days before taking the stand at trial, he declined to provide further medical services to Mr. Kidd. However, Mr. Kidd's dissatisfaction with the witnesses he presented cannot now be said to be the court's error.
 {¶ 37} Moreover, the information Mr. Kidd sought to elicit from these witnesses was presented to the jury. Dr. Battles, the Portage County jail physician testified as to the serious condition of his eye, which caused him to refer Mr. Kidd to an eye specialist. He also detailed Mr. Kidd's other injuries for the jury. As for a videographer, although all agreed that the videotape played very quickly and had to be examined frame by frame in order to identify parties, the jury was given both a narrative of what was occurring on the tape by Officer Cox and the tape was entered into evidence during deliberations. As for the issue of a toxicologist, Mr. Sorace's medical records, which included the toxicology report documenting the presence of both alcohol and opiates in Mr. Sorace's *Page 12 
blood stream was submitted to the jury. Finally, Dr. Brunia testified that Mr. Kidd suffered from diabetes and that Mr. Kidd's blood sugar was out of control prior to his incarceration for this charge.
 {¶ 38} We cannot say the court abused its discretion in determining that Mr. Kidd was not indigent. Rather, the court gave Mr. Kidd every opportunity to establish his indigent status, and further, continually revisited the matter as the case proceeded to trial. Mr. Kidd did submit an indigency affidavit on March 1, 2006; however, he admitted that he was capable of earning income if the court modified his house arrest, which it did do. Thus, the court gave him every opportunity to obtain employment while awaiting trial.
 {¶ 39} Mr. Kidd's first assignment of error is without merit.
 {¶ 40} Jury Instructions
 {¶ 41} In his second assignment of error Mr. Kidd argues that the court abused its discretion in failing to include a proper jury instruction on self-defense and in denying his request for a character and reputation jury instruction. We find these arguments to be without merit.
 {¶ 42} "Requested jury instructions should be given if they are (1) correct statements of the applicable law, (2) relevant to the facts of the case, and (3) not included in the general charge to the jury."State v. Mitchell, Jr., 11th Dist. No. 2001-L-042, 2003-Ohio-190, ¶ 10, citing State v. DeRose, 11th Dist. No. 2000-L-076, 2002-Ohio-4357, ¶ 33, quoting State v. Edwards, 11th Dist. No. 2001-L-005, 2002-Ohio-3359, ¶ 20. "An appellate court is to review a trial court's decision regarding a jury instruction to determine whether the trial court abused its discretion." Id., citing State v. Wolons (1989),44 Ohio St.3d 64, 68. *Page 13 
 {¶ 43} Character Evidence Instruction
 {¶ 44} On the last day of trial, on June 22, 2006, before the jury was seated, the court reviewed the jury instructions with the state and Mr. Colvin, Mr. Kidd's counsel. At that time, Mr. Colvin sought to introduce a character and reputation evidence instruction based on the character witnesses he presented to the jury, all of whom testified as to Mr. Kidd's peaceful nature. Specifically, the following colloquy occurred:
 {¶ 45} "The Court: It's the Defendant's request for jury instructions. First of all, the issue of character and representation.
 {¶ 46} "Mr. Muldowney [For the State]: I would object to that, Your Honor. I believe the Jury's heard the witnesses testify as to the Defendant's reputation. Certainly that can be mentioned in his closing argument without the court additionally instructing.
 {¶ 47} "The Court: I think that would be appropriate, Mr. Colvin. There is general instructions throughout that go to the weight of the evidence and what people are to consider and what weight they are to give to each person's testimony. So I agree, that would be more prejudicial against the State. * * *"
 {¶ 48} Thus, the court determined that such a jury instruction would be prejudicial to the state and that Mr. Colvin had every opportunity during closing arguments to emphasize that these witnesses testified as to Mr. Kidd's peaceful character, which he did when he stated: "Yet, the State wants you to believe although you see numerous witnesses talk about his character, how he's never been in trouble, how he's never a violent person, how he always tells the truth. * * *"
 {¶ 49} We find no abuse of discretion in the court's determination, nor can we say that the lack of such an instruction changed the outcome of this trial. *Page 14 
 {¶ 50} Self-Defense Instruction
 {¶ 51} Mr. Kidd also argues that the court erred with respect to the instruction given on self-defense. Specifically, the court failed to include a statement as to the specific burden of proof required for a defendant establishing self-defense by a preponderance of the evidence. The transcript reveals that when jury instructions were being discussed Mr. Colvin brought this to the attention of the court and the state did not object to such an addition. However, the jury instructions given to the jury both orally and in writing failed to include either the words "preponderance of the evidence" or that as per Ohio Jury Instructions 411.31, the defendant "must prove by a greater weight of the evidence * * *."
 {¶ 52} In a similar case, State v. Cooper, 170 Ohio App. 3d 418,2007-Ohio-1186, the Fourth District Court of Appeals reversed, stating: "The failure to give a proper instruction on the burden of proof is akin to structural error in this case. Given the fundamental nature and importance of the distinction between the state's burden of proof (beyond a reasonable doubt) and the defendant's (a mere preponderance), we cannot say with any sense of confidence that this omission did not affect the outcome of the trial. We believe the structural nature of this omission leads to such a lack of confidence in the verdict that amounts to error per se." Id. at ¶ 35.
 {¶ 53} We find this reasoning persuasive insofar as the lack of a proper jury instruction on Kidd's burden of proof leads to the logical conclusion that the jury applied the only other burden of proof standard that was described, that of "beyond a reasonable doubt." However, we do not find this to be an error per se in this case because Mr. Kidd failed to establish all of the elements of self-defense. Thus, the error is harmless at best. *Page 15 
 {¶ 54} Specifically, Mr. Kidd was required to establish that he was not the initial aggressor and that he did not violate his duty to retreat. State v. Vinson, 11th Dist. No. 2006-L-238, 2007-Ohio-5199, at ¶ 49. The evidence at trial clearly demonstrates that Mr. Kidd returned to the bar two times and was involved in a verbal altercation with Mr. Sorace. Secondly, all of the witnesses testified that Mr. Kidd was the initial aggressor in the fight. Further, after the charge was given, the trial court, at side bar, gave counsel the opportunity to object to the charge, which he failed to do nor did he object to the written charge. "[I]t is well-established that `the failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would havebeen otherwise.' * * * State v. Underwood (1983), 3 Ohio St.3d 12, syllabus, quoting State v. Long (1978), 53 Ohio St.2d 91; Crim.R. 52(B). Furthermore, `notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' Long, paragraph three of the syllabus." State v. Bentley, 11th Dist. No. 2004-P-0053, 2005-Ohio-4648, ¶ 49, quoting Sate v. Breland, 11th Dist. No. 2003-A-0066,2004-Ohio-7238, ¶ 18-19, quoting State v. Gordon (Mar. 22, 1996), 11th Dist. No. 92-A-1696, 1996 Ohio App. LEXIS 1078, at 3-4.
 {¶ 55} Although we find the court erred in failing to give the jury an instruction on the burden of proof Mr. Kidd was required to establish in order to prove self-defense, we find that error harmless based upon the specific facts of this case since Mr. Kidd failed to establish the affirmative defense of self-defense.
 {¶ 56} We find Mr. Kidd's second assignment of error to be without merit.
 {¶ 57} Exclusion of Evidence *Page 16 
 {¶ 58} In his third assignment of error, Mr. Kidd contends that the court erred in excluding evidence of the effects of the victim's excessive alcohol and opiate consumption on the night of the incident. Specifically, Mr. Kidd argues that evidence of the alcohol and opiate consumption "could have produced a situation in which the victim felt no pain and could have continued fighting even after being stabbed multiple times." We find this contention to be without merit.
 {¶ 59} "The determination to admit or exclude evidence is within the sound discretion of the trial court and will not be reversed by an appellate court absent a showing of an abuse of discretion."Vinson at ¶ 48, citing State v. Sledge, 11th Dist. No. 2001-T-0123, 2003-Ohio-4100, ¶ 20, citing State v. Rootes (Mar. 23, 2001), 11th Dist. No. 2000-P-0003, 2001 Ohio App. LEXIS 1391, at 4-5, citing Renfro v.Black (1990), 52 Ohio St. 3d 27, 32. Abuse of discretion connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Id. citing State v.Montgomery (1991), 61 Ohio St. 3d 410, 413, quoting State v. Adam
(1980), 62 Ohio St.2d 151, 157.
 {¶ 60} Specifically, Mr. Kidd argues that the trial court erred in refusing to allow the emergency room physician, Dr. Haver, to testify as to Mr. Sorace's toxicology report. Mr. Kidd's counsel began to question Dr. Haver on the toxicology report when the state objected to its relevance. The court sustained the objection and the following colloquy occurred in a sidebar discussion:
 {¶ 61} "Mr. Muldowney [for the state]: This is the Emergency Room Doctor and you know it. This is not the toxicologist.
 {¶ 62} "The Court: That's the thing. You have to have the toxicologist.
 {¶ 63} "Mr. Colvin [Kidd's counsel]: He can't testify as to what's in the report? *Page 17 
 {¶ 64} "The Court: No. It has to be the toxicologist. That's your witness that you can bring in.
 {¶ 65} "Mr. Muldowney: His report is the part of that report that is the examination of the stab wounds and the treat for that. He's not the toxicologist. The toxicologist is-.
 {¶ 66} "* * *
 {¶ 67} "The Court: It has to be him and then you have to prove to me it's relevant."
 {¶ 68} "Selfdefense is an affirmative defense, in which the defendant's burden includes proving his state of mind; that is, that he had a bona fide belief that he was in imminent danger of death or great bodily injury." State v. Dunivant, 5th Dist. No. 2003CA00175,2005-Ohio-1497, ¶ 19, citing State v. Robbins (1979), 58 Ohio St.2d 74,80.
 {¶ 69} It is well established that "[a] defendant may successfully assert self-defense without resort to proving any aspect of a victim's character." State v. Barnes (2002), 94 Ohio St.3d 21, 24.
 {¶ 70} Albeit, "[u]nder certain circumstances, scientific evidence of the victim's drug use may be relevant to the defendant's state of mind. * * * However, admission of such evidence is at the discretion of the trial court based on the circumstances of the case." Dunivant at ¶ 19. See State v. Davis, 5th Dist. No. 2003 CA 429, 2004-Ohio-7056, ¶ 26-28.
 {¶ 71} In this case, evidence of Mr. Sorace's alcohol and drug consumption and his ability to feel pain is simply not relevant to Mr. Kidd's self-defense argument. Whether or not Mr. Sorace was so intoxicated that he was numbed to the stabbing at the time it was occurring does not negate the fact that Mr. Kidd stabbed Mr. Sorace *Page 18 
numerous times, whether or not it diminished Mr. Sorace's ability to pain, and thus enabled him to continue fighting.
 {¶ 72} Moreover, even if Mr. Sorace's alcohol and drug use was relevant, the court still did not abuse its discretion in refusing Mr. Colvin from cross-examining Dr. Haver as to the toxicology report because Dr. Haver testified that he did not recall the report, nor was he the author of the report. That is not to say that an emergency room doctor may never be qualified to render an opinion based upon facts or data admitted into evidence at the trial (i.e. the victims' toxicology report ordered by this emergency room doctor), but even assuming some relevance the trial court must exclude evidence that may mislead or confuse the jury. Evid.R. 403(A). Mr. Kidd failed to demonstrate any nexus between the alcohol and opiate use and his self-defense claim. Furthermore, Mr. Kidd failed to proffer the evidence to the court. "Evid.R. 103(A)(2) provides that, in order to use exclusion of evidence as a basis for appeal, the substance of the evidence must be made known to the court by proffer or must be `apparent from the context within which the questions were asked.'" Petitto v. Malaney, 11th Dist. No. 2001-L-065, 2002-Ohio-2442, ¶ 8. See, also, State v. Davie,80 Ohio St.3d 311, 327; State v. Brooks (1989), 44 Ohio St.3d 185, 195. Moreover, the state introduced Mr. Sorace's medical records into evidence, so the fact that Mr. Sorace was under the influence of opiates and alcohol was presented to the jury.
 {¶ 73} Mr. Kidd's third assignment of error is without merit.
 {¶ 74} Prosecutorial Misconduct
 {¶ 75} In his fourth assignment of error, Mr. Kidd argues that the court erred in overruling his motion for mistrial since certain acts of the prosecutor resulted in reversible error, which rendered Kidd's trial fundamentally unfair and unconstitutional. *Page 19 
Specifically, Mr. Kidd contends the prosecutor's conduct was improper in three respects: (1) that the prosecutor repeatedly stated that the victim had been stabbed thirteen times without any evidentiary support; (2) that the prosecutor purposefully passed on all of his peremptory challenges in order to ensure that the one black juror on the panel was never seated; and lastly, (3), that the prosecutor represented to the jury that Ms. Richmond was not promised anything for her testimony in this case since she was offered a plea bargain for the charges she also faced from this incident. We find these contentions to be without merit.
 {¶ 76} Claimed Misstatements as to the Evidence
 {¶ 77} We apply a two prong test in reviewing prosecutorial statements for error. The first inquiry is whether the challenged statements were improper, and if so, then second, whether they prejudicially affected the appellants' substantial rights. State v. Jones (2000),90 Ohio St.3d 403, 420. Moreover, a prosecutor's improper statement will justify the reversal of a conviction only if the claim, after being reviewed against the entire record, undermines the "fairness of the trial and contributed to a miscarriage of justice." U.S. v. Obregon (C.A.11, 1990),893 F.2d 1307, 1310. See, also, State v. Mauer (1984), 15 Ohio St.3d 239, 266;Jones at 420. Thus, in general, the conduct of a prosecuting attorney during trial "cannot be made a ground of error unless that conduct deprives the defendant of a fair trial." Id. State v. Jenks (1991),61 Ohio St.3d 259, 280-281.
 {¶ 78} Furthermore, "the Supreme Court of Ohio in State v. Slagle
(1992), 65 Ohio St.3d 597, 607, stated: `[w]hen we review a prosecutor's closing argument we ask two questions: whether the remarks were improper, and if so, whether they prejudicially affected substantial rights of the defendant.'" State v. Albanese, 11th Dist. No. 2005-P-0054, *Page 20 2006-Ohio-4819, at ¶ 27, citing State v. Smith (1984), 14 Ohio St.3d 3,14. "The closing argument is considered in its entirety to determine whether it was prejudicial." Id., citing State v. Moritz (1980),63 Ohio St.2d 150, 157.
 {¶ 79} Moreover, "[c]ounsel is generally given latitude during closing arguments to state what the evidence has shown and what inferences can be made to the jury." Id. at ¶ 28, citing State v. Hearns, 11th Dist. No. 2002-P-0050, 2004-Ohio-385, ¶ 15, citing State v. Davis (1996),76 Ohio St.3d 107, 117.
 {¶ 80} "In determining whether the prosecutor's statements affected a substantial right of the defendant, an appellate court should consider the following four factors: `(1) the nature of the remarks; (2) whether an objection was made by defense counsel; (3) whether the court gave any corrective instructions; and (4) the strength of the evidence presented against the defendant.'" Id., citing Hearns at ¶ 15, citing State v.Braxton (1995), 102 Ohio App.3d 28, 41.
 {¶ 81} In the case at bar we do not agree with Mr. Kidd that the trial court erred and abused its discretion in denying his motion for new trial, which was, in part, based on alleged misconduct of the prosecutor. Mr. Kidd first claims that the prosecutor continually stated throughout trial, as well as in closing arguments, that Mr. Sorace was stabbed thirteen times and that this was clearly an error since the state failed to establish the exact number of wounds. This contention is without merit since Mr. Sorace himself testified that he was stabbed thirteen times. Although Dr. Haver, the attending physician on the night of the incident, did not know exactly how many knife wounds Mr. Sorace suffered, he did testify that he found multiple stabbings. In addition, Mr. Sorace's medical records were entered into evidence by the state which the jury could read for themselves. Mr. Kidd testified that he stabbed Mr. Sorace three *Page 21 
or four times. Thus, there was conflicting evidence as to how many times Mr. Sorace was stabbed, but that issue was to be determined by the trier of fact based upon the evidence and not the arguments of counsel.
 {¶ 82} "It is well-settled that when assessing the credibility of witnesses, `[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" State v. McKinney, Jr., 11th Dist. No. 2006-L-169,2007-Ohio-3389, ¶ 49, citing State v. Grayson, 11th Dist. No. 2006-L153,2007-Ohio-1772, ¶ 31, citing State v. Awan (1986), 22 Ohio St.3d 120,123. "Indeed the factfinder is free to believe all, part, or none of the testimony of each witness appearing it before." Id., citingGrayson at ¶ 19, citing Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, 8. Thus, it is clear that whether the jury chose to believe Mr. Sorace's testimony or Mr. Kidd's, the prosecutor's reference to the number of stabbings, and even if there was exaggeration, would be harmless error indeed, especially in light of Mr. Kidd's own admissions. Thus, we agree with the trial court who found this contention to be without merit.
 {¶ 83} A Reverse Batson Challenge
 {¶ 84} Secondly, Mr. Kidd argues that the prosecutor purposefully passed on all of his peremptory challenges in order to prevent the one black juror from being seated on the jury. Thus, Mr. Kidd argues that the prosecutor abused his peremptory challenges in such a way that they still had a discriminatory effect and that this is a type of reverse"Batson" discrimination.
 {¶ 85} "In Batson v. Kentucky (1986), 476 U.S. 79, 96-97, the Supreme Court of the United States held that the use of peremptory challenges to strike African-Americans *Page 22 
from a jury venire may raise an inference of discrimination compelling the prosecutor to set forth a racially neutral explanation for his or her actions. In order to invoke judicial scrutiny, however, a defendant must establish a prima facie case of discrimination. To wit, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Next, the defendant is entitled to rely upon the fact that peremptory challenges constitute a jury selection practice that allows `* * * "those to discriminate who are of a mind to discriminate." Lastly, a defendant must show that these facts, along with any other relevant circumstances, raise an inference that the prosecutor used that practice to exclude the juror(s) from the petit jury due to their race.'" State v. Burgess, 11th Dist. No. 2003-L-069, 2004-Ohio-4395, ¶ 26.
 {¶ 86} There is simply no evidence of the insidious discrimination that Mr. Kidd alleges occurred in this case. Not only did Mr. Kidd fail to object during the jury voir dire, but he failed to allege a prima facie case of discrimination.
 {¶ 87} Ms. Richmond's Plea Bargain
 {¶ 88} Finally, Mr. Kidd contends that the prosecutor misled the jury as to Ms. Richmond's plea bargain. Ms. Richmond first testified on June 20, 2006, for the state who engaged her in the following colloquy concerning her testimony, which Mr. Kidd contends misled the jury:
 {¶ 89} "Mr. Muldowney: Okay. Now, you — before we start, okay, I met with you once in my office, what, three weeks ago?
 {¶ 90} "Ms. Richmond: Around there.
 {¶ 91} "Mr. Muldowney: And we talked about this; is that right? *Page 23 
 {¶ 92} "Ms. Richmond: Yes.
 {¶ 93} "Mr. Muldowney: Now, you had — and I don't have your file here, you had entered a plea to a reduced charge; is that right?
 {¶ 94} "Ms. Richmond: It was a plea. They didn't promise anything.
 {¶ 95} "Mr. Muldowney: Aggravated assault?
 {¶ 96} "Ms. Richmond: I pled to aggravated assault.
 {¶ 97} "Mr. Muldowney: And did I promise you anything.
 {¶ 98} "Ms. Richmond: No.
 {¶ 99} "Mr. Muldowney: The judge didn't promise you anything about what was going to happen?
 {¶ 100} "Ms. Richmond: No, sir.
 {¶ 101} "Mr. Muldowney: And you agreed that you would testify truthfully here, right?
 {¶ 102} "Ms. Richmond: Yes."
 {¶ 103} Mr. Kidd's contention is without merit as Ms. Richmond testified at trial the following day that she agreed to testify for the state in Mr. Kidd's case and accepted the plea bargain since her primary concern was to avoid incarceration:
 {¶ 104} "Mr. Colvin: At some point yesterday, you talked about why you took that plea bargain.
 {¶ 105} "Ms. Richmond: I did it for my kids.
 {¶ 106} "Mr. Colvin: Can you explain that for the jurors?
 {¶ 107} "Ms. Richmond: Um, I would probably still be sitting jail right now if I didn't take the bargain. I pled to a felony four, felonious assault, I mean aggravated assault, I pled to. *Page 24 
 {¶ 108} "Mr. Colvin: Were you afraid of losing custody of your children?
 {¶ 109} "Ms. Richmond: No. I was afraid of not being with my children and being in prison.
 {¶ 110} "* * *
 {¶ 111} "Mr. Colvin: And you said that you — you agreed to in exchange for a plea, you agreed to testify here truthfully?
 {¶ 112} "Ms. Richmond: Yes."
 {¶ 113} Thus, the jury knew that Ms. Richmond accepted a plea bargain to a reduced charge stemming from this incident, that she did so in concern for her children, and that she served a sentence of approximately fifty to sixty days. There is nothing to suggest that the prosecutor misled anyone.
 {¶ 114} We cannot say that the trial court abused its discretion in finding prosecutorial misconduct did not occur in this case. Indeed, even if it so existed, there is nothing to suggest that a substantial right of Mr. Kidd's has been so affected that would warrant a new trial.
 {¶ 115} Mr. Kidd's fourth assignment is without merit.
 {¶ 116} The judgment of the Portage County Court of Common Pleas is affirmed.
DIANE V. GRENDELL, J., concurs,
COLLEEN MARY OTOOLE, J., dissents with Dissenting Opinion.