DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Craig Dunivant, appeals from his conviction in the Stark County Court of Common Pleas on a charge of murder with a firearm specification and carrying a concealed weapon. We affirm.
 I. {¶ 2} Mr. Dunivant is an admitted drug dealer who shot and killed one Ruben Floyd. According to Dunivant, Floyd himself was a notorious drug dealer and a menacing brute, with a misunderstanding over a prior drug deal. Rumor had it that Floyd intended to hurt or even kill Dunivant as a consequence of the misunderstanding. But, when questioned by Dunivant, Floyd had denied any malicious intent and had taken no action against Dunivant.
 {¶ 3} Floyd had approached one Raymond Strain, a personal family friend to both men and respected community member, requesting that Strain mediate the dispute peacefully. Strain's involvement was largely ineffective, as he was unable to bring the two men together for mediation. However, Strain had become aware of Floyd's position and point of view, as well as certain information regarding the misunderstanding, the debt, and Floyd's possession of Dunivant's truck.
 {¶ 4} On the day of the murder, Floyd had called Dunivant to meet in a nearby parking lot, purportedly so that Floyd could return Dunivant's truck and the two could resolve their differences. Dunivant walked to the meeting but carried a handgun concealed in a cologne bag. On arrival, he found Floyd waiting in the driver's seat of his own truck, and Floyd allegedly demanded that Dunivant go along for a ride. According to Dunivant, Floyd then reached as if bringing out a gun and Dunivant shot him seven times through the open passenger door, killing him. Upon investigation it was determined that all seven wounds were on the side or back of Floyd's body, as if he had not been facing Dunivant at the time of the shooting. Furthermore, it was determined that Floyd had been unarmed.
 {¶ 5} Mr. Dunivant was indicted for murder with a firearm specification, in violation of R.C. 2903.02(A) and R.C. 2941.145, and carrying a concealed weapon, in violation of R.C. 2923.12(A). A jury convicted him of both charges and the court sentenced him accordingly. Mr. Dunivant now appeals and asserts six assignments of error for review.
 II. A. First Assignment of Error
"The trial court abused its discretion by permitting the introduction of otherwise inadmissible hearsay in violation of the ohio rules of evidence and the appellant's right of confrontation guaranteed by the united states and ohio constitutions."
 {¶ 6} Mr. Dunivant alleges that the trial court erred in admitting testimony from Raymond Strain regarding his conversations with Floyd about the attempted mediation, during the State's cross-examination. Specifically, Dunivant contends that Strain's recitation of Floyd's version of the dispute and peaceful attempts to reconcile was inadmissible hearsay that violated his Sixth Amendment right to confront witnesses and prejudiced his defense. We disagree.
 {¶ 7} The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" InCrawford v. Washington, the United States Supreme Court explained that this, the Confrontation Clause, encompasses the concept of "testimonial" statements as determinative of who are "witnesses" for the purpose of such confrontation on questions of hearsay:
"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does [Ohio v. Roberts (1980), 448 U.S. 56,65 L.Ed.2d 597], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (Emphasis added.) Crawford v. Washington (2004), 541 U.S. 36,158 L.Ed.2d 177, 203.
Thus, the threshold determination becomes, whether the hearsay statements in question are classified as testimonial. Although theCrawford Court explicitly abstained from providing an exacting definition of testimonial, it did provide three formulations for such determination, without expressly adopting any. See id. at 203. They are, as aptly summarized by the First Circuit Court of Appeals:
"The Crawford Court declined to provide a comprehensive definition of testimonial statements. It did, however, provide three formulations of the core class of testimonial statements.
"[1] In the first, testimonial statements consist of ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.
"[2] The second formulation described testimonial statements as consisting of extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.
"[3] Finally, the third explained that testimonial statements are those made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
"While the Court declined to settle on a single formulation, it noted that, whatever else the term testimonial covers, it applies to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. These are the modern abuses a which the Confrontation Clause was directed." (Internal citations, quotations and edits omitted; paragraph breaks and numbering added.) Horton v.Allen (C.A.1, 2004), 370 F.3d 75, 84, citing and quoting Crawford,158 L.Ed.2d at 193, 203.
Notably, questions of the scope and effect of constitutional protections, such as the Sixth Amendment, are matters of law and therefore reviewed de novo. See United States v. Wilmore (C.A.9, 2004), 381 F.3d 868,871.
 {¶ 8} In the present case, Floyd's statements to Strain, made for the purpose of mediating a drug-deal induced debt, were unequivocally extra-judicial and do not fall within any of the three tendered formulations that would make them testimonial. Therefore, according toCrawford, the Confrontation Clause is not implicated and state evidence law governs these nontestimonial statements. Crawford, 158 L.Ed.2d at 203. See, also, Horton, 370 F.3d at 84 (finding statements to friends to benontestimonial, on the basis that they would not reasonably be expected to be used at trial); United States v. Savoca (S.D.N.Y., 2004),335 F. Supp.2d 385, 393 (admitting statements to girlfriend because an "element of officiality appears to be the hallmark of a `testimonial statement'").
 {¶ 9} Despite the inapplicability of the Sixth Amendment, Dunivant contends that Strain's cross-examination testimony of Floyd's statements was inadmissible hearsay; i.e., statements other than made by the declarant at trial that are offered into evidence to prove the truth of the matter asserted. See Evid.R. 801; Evid.R. 802. At trial, Dunivant questioned Strain on direct examination about his knowledge of the dispute and his role in the mediation, eliciting certain hearsay testimony that arose from Floyd's conversations with Strain during the course of that relationship. The State did not object, but sought to inquire further on cross-examination. Immediately upon beginning this inquiry, Dunivant objected and the following sidebar discussion ensued:
"THE COURT: Well, here is my problem, [to Dunivant's counsel], is that, ah, this witness has testified [on direct] that he was asked to mediate something and there were some questions about that. He said he didn't know, didn't get to the particulars of it. And then there was some question about what the amount was. It was 50,000.
[S]ince you've opened it up, I'm inclined to let the prosecutor ask questions about what he did know about the transaction. I mean —
"[Dunivant's Counsel]: Yeah.
"THE COURT: — you already brought that up.
"[Dunivant's Counsel]: That's not something he knew about the transaction. It was something he was told about the transaction.
I'm going to object.
I think — the fact we've opened the door, but is — for my purposes this idea of mediation was the suggestion that, you know, there was a problem between the two and other people were getting involved in it and he talked to other people and he was trying to contact [Dunivant].
Allow him to testify this is what Ruben Floyd was going to do that day, that certainly is hearsay. And I —
"THE COURT: I didn't get —
"[Dunivant's Counsel]: I asked him what basis, he claims he didn't know what the dispute was about.
"THE COURT: Yeah, but I didn't get [that the State] was saying he was going to say this is what, what he was going to do that day.
Is what was, why Mr. Floyd had the truck.
"[Dunivant's Counsel]: Right.
"THE COURT: We've had testimony all over the place about that. I don't see why I should shut down this.
"[Dunivant's Counsel]: I asked him what basis, he claims he didn't know what the dispute was about.
"[State]: Two points: I am clearly going to cross examine Mr.
Dunivant about this issue [i.e, why Floyd had Dunivant's truck]. I'm clearly going to argue to the jury about this issue.
All the information that Mr. Strain presented on direct examination was given to him by Ruben Floyd. One side of the mediation, [Dunivant's], he was trying to avoid trouble.
The other is that Mr. Floyd wanted this person to just get it resolved. There is one side; the other side is there was no problem."
Thereafter, the court overruled the objection and allowed the testimony.
 {¶ 10} While Dunivant contends that the testimony[1] constitutes inadmissible hearsay, the State responds that even though these statements are hearsay, once introduced by the defense on direct examination, the State was entitled to explore them on cross-examination. Under the circumstances of the present case, we are persuaded that the State offers the better reasoned position.
 {¶ 11} A trial court's admission of evidence is reviewed for abuse of discretion. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶ 79. An abuse of discretion is more than an error of law or judgment, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Importantly, under this standard, an appellate court may not merely substitute its judgment for that of the trial court. Pons v. Ohio StateMed. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 12} "Under the rule of curative admissibility, or the `opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." United States v. Whitworth (C.A.9, 1988),856 F.2d 1268, 1285. See, also, United States v. Moody (C.A.6, 1967),371 F.2d 688, 693 ("With the door opened this widely in favor of [defendant], we cannot say that the District Judge's rulings in favor of appellee's proffered hearsay on the same subject was an abuse of judicial discretion or constituted reversible error."); State v. Croom (Jan. 18, 1996), 8th Dist. No. 67135, at *17 ("Invited error would preclude a defense counsel who induces hearsay evidence on cross-examination from precluding further hearsay testimony on re-direct examination.").
 {¶ 13} In the present case, Dunivant called Strain to the stand and induced the hearsay testimony resulting from his conversations with Floyd, presumptively to support his self defense claim. We cannot conclude that the trial court abused its discretion by allowing the State, on cross-examination, to elicit reciprocal evidence in order to rebut any false impression that may have resulted from the direct examination. Therefore, Dunivant's first assignment of error is overruled.
 B. Second Assignment of Error
"The trial court erred in excluding evidence regarding the decedent's violent threats against appellant after the state `opened the door' for the admissibility of the testimony for rebuttal purposes."
 {¶ 14} Mr. Dunivant asserts that the trial court erred in excluding certain rebuttal testimony as inadmissible hearsay because the State had opened the door to this evidence during its case in chief. Specifically, Dunivant called an FBI agent to relate hearsay statements from an unnamed source[2] alleging that Floyd had made threats against Dunivant,[3]
and urges admissibility based on his need to rebut the State's witnesses who denied having ever heard Floyd make any threats against Dunivant. This argument is the inverse of Dunivant's first assignment of error, an argument which is still unavailing as employed in this new context.
 {¶ 15} At trial, the State called certain witnesses on direct examination who testified that they had never heard Floyd threaten Dunivant. Notably, such a denial is not hearsay (just as an affirmative response would not have been hearsay), as it is not the recitation of any "statement" or assertion. See Evid.R. 801(A). Rather, it is testimony as to an act of which that witness has personal knowledge. See Evid.R. 602. In response, Dunivant sought to admit the FBI agent's hearsay, or multiple hearsay, statements, which the court excluded.
 {¶ 16} Mr. Dunivant contends that the testimony must be admissible under the doctrine of curative admissibility, that the State opened the door, and that it is necessary to introduce responsive evidence on the same issue to refute the false impression resulting from the earlier testimony. See Whitworth, 856 F.2d at 1285; Moody, 371 F.2d at 693;Croom, at *17. However, even if these circumstances meet the predicates of the doctrine, and it is not evident that they do, the trial court maintains discretion in admitting or excluding such evidence. Id. We cannot conclude that the trial court abused its discretion by excluding this double or triple hearsay evidence to refute direct testimony by the State's witnesses. Therefore, Dunivant's second assignment of error is overruled.
 C. Third Assignment of Error
"The trial court erred in excluding evidence concerning the decedent's use of cocaine."
 {¶ 17} Mr. Dunivant asserts that the trial court erred in excluding particular evidence which he sought to introduce at trial. Specifically, Dunivant contends that evidence of cocaine in Floyd's system on the day of the murder was improperly excluded, as it was relevant to his defense. We disagree.
 {¶ 18} A trial court's admission of evidence is reviewed for abuse of discretion. Ahmed at ¶ 79. See Blakemore, 5 Ohio St.3d at 219; Pons,66 Ohio St.3d at 621. During trial, the following exchange took place at a sidebar conference:
"[Dunivant's Counsel]: Your Honor, at this time I would simply proffer for the record that, if permitted to, I would ask [the coroner] about the cocaine metabolites found in [Floyd's] body. Based upon the Court's ruling and the motion in limine, I'm not asking that question; but for the Court's ruling, that would be asked.
"THE COURT: You would be asking the question as [to] whether any were found?
"[Dunivant's Counsel]: Yes.
And it's my understanding, based upon the records we received, that in fact cocaine metabolites were found in Ruben Floyd's body, chemical test that was performed, and I believe that's relevant.
"THE COURT: And I'm not going to allow that without additional testimony."
Mr. Dunivant's counsel offered no further protest and proffered no additional supporting witnesses or testimony.
 {¶ 19} Self defense is an affirmative defense, in which the defendant's burden includes proving his state of mind; that is, that he had a bona fide belief that he was in imminent danger of death or great bodily injury. State v. Robbins (1979), 58 Ohio St.2d 74, 80. Under certain circumstances, scientific evidence of the victim's drug use may be relevant to the defendant's state of mind:
"The trial court excluded the evidence concerning the decedent's use of cocaine on the basis that it was not probative or relevant to an issue in the case. If allowed, the coroner would have testified that the decedent had used cocaine on the day of the incident; that while not typical, cocaine use may cause dysphoria or bad feelings; and that cocaine affects an individual's judgment. We believe this testimony was relevant to the issue of who was the aggressor and that the trial court erred in excluding it." State v. Baker (1993), 88 Ohio App.3d 204, 212.
However, admission of such evidence is at the discretion of the trial court based on the circumstances of the case. See State v. Davis, 5th Dist. No. 2003 CA 429, 2004-Ohio-7056, at ¶ 26-28 (excluding evidence of victim's cocaine possession as irrelevant in the context of the particular self defense argument).
 {¶ 20} In Baker, the Court reasoned:
"[A]ppellant was improperly precluded from presenting witnesses to testify that the deceased had a reputation for violence while he was under the influence of alcohol [or drugs]. Given that such evidence should have been admitted, it follows that whether the deceased was in fact under the influence of alcohol [or drugs] at the time of the incident was important to the issue of self-defense, relevant specifically to the issue of who was more likely the aggressor in the incident. Consequently, the trial court erred in excluding the evidence as to decedent's blood-alcohol [or drug] level." Baker,88 Ohio App.3d at 211-12.
 {¶ 21} In the present case, Dunivant was allowed to introduce extensive evidence of Floyd's reputation for violence, including a specific instance when Floyd allegedly held a man's ear to a grinding machine, although Floyd's violent tendencies were never alleged to have been influenced by drug use. Thus, Dunivant's rationale is further attenuated than that in Baker, as there was no testimony suggesting a causal connection between Floyd's drug use and the violence, nor any evidence that Dunivant even suspected that Floyd was under the influence of cocaine at the time of the killing. Dunivant sought to introduce Floyd's cocaine use under the theory that cocaine use causes irrational behavior in some people, which would then tend to prove that Floyd was the initial aggressor. Without supporting expert testimony, even this theory is speculative. See Parton v. Weilnau (1959), 169 Ohio St. 145, 151
(finding expert testimony a predicate to introduction of blood alcohol content, for purpose of asserting its effect). Furthermore, Dunivant offered no evidence that such a cause and effect reaction was typical in Floyd, as would support such an inference in this case. This type of unsupported speculation may lead to unfair prejudice, confusion of the issues, or misleading of the jury, and overcome its probative value. See Evid.R. 403.
 {¶ 22} The trial court refused to admit this evidence "without additional testimony." We cannot conclude that the trial court abused its discretion by doing so. Mr. Dunivant's third assignment of error is overruled.
 D. Fourth Assignment of Error
"The trial court erred when it refused to submit the appellant's proposed jury instructions thereby denying appellant's right to due process and a fair trial guaranteed by the united states and ohio constitutions."
 {¶ 23} Mr. Dunivant asserts that the trial court erred in refusing his specifically requested jury instruction on the effect of a reasonably mistaken belief that he was in imminent danger, and instead relying on the standard instruction. Mr. Dunivant does not cite any authority for this position, but argues that the standard instruction is "convoluted" and "misleading." We disagree.
 {¶ 24} The necessity of a particular jury instruction is a question of law to be reviewed de novo, unless the trial court's decision was based on the discretionary determination as to whether the evidence presented at trial was sufficient to require the particular instruction. State v.Lessin (1993), 67 Ohio St.3d 487, 494. Where the question is one of supporting evidence, the trial court's determination will be overturned on appeal only upon finding an abuse of discretion. State v. Wolons
(1989), 44 Ohio St.3d 64, 68. In the present case, there is no dispute over the propriety of a self defense instruction. At issue is Dunivant's claim that the instruction must include an explicit statement that the killing may be justified as self defense even though the killer was mistaken as to the existence of the danger.
 {¶ 25} The trial court refused Dunivant's proposed instruction and instructed the jury on self defense, stating in part:
"In determining whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the defendant with his characteristics and his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of Ruben Floyd and decide if his acts and words caused the defendant reasonably [and] honestly to believe that he was about to be killed or receive great bodily harm."
This is substantially identical to Ohio's current model jury instruction. See 4 Ohio Jury Instructions (2004), Section 411.35(2), at 81.
 {¶ 26} Under a similar challenge, the Twelfth District Court of Appeals upheld this instruction, stating: "The phrase `honest belief' `naturally includes the possibility that the defendant may have been mistaken in his belief.'" State v. Hamilton, 12th Dist. No. CA2001-04-098, 2002-Ohio-3862, at ¶ 17, quoting State v. Evans, 8th Dist. No. 79895, 2002-Ohio-2610, at ¶ 51. Mr. Dunivant urges this Court to disregard this holding and find the model instruction insufficiently protective to the defendant and otherwise misleading to the jury.
 {¶ 27} We do not find the model instruction to be convoluted or misleading. Rather, we agree with the Twelfth District in this matter and conclude that a finding of "honest belief" incorporates the concept of mistake. Mr. Dunivant's fourth assignment of error is overruled.
 E. Fifth Assignment of Error
"The verdict is against the manifest weight and sufficiency of the evidence and contrary to law."
 {¶ 28} Mr. Dunivant admits to shooting Ruben Floyd, but alleges that the jury overlooked his justification for the shooting and insists that he acted in self defense. From this, Dunivant charges that the verdict was against the manifest weight and sufficiency of the evidence and should be reversed. We disagree.
 {¶ 29} Reversal on manifest weight grounds is reserved for the exceptional case where the evidence demonstrates that the "trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." State v. Otten (1986),33 Ohio App.3d 339, 340. Accord State v. Thompkins (1997),78 Ohio St.3d 380, 387. A conviction may be upheld even when the evidence is susceptible to some possible, plausible, or even reasonable theory of innocence. See State v. Jenks (1991), 61 Ohio St.3d 259, 272. Similarly, on conflicting testimony, "a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4.
 {¶ 30} Sufficiency of the evidence and weight of the evidence are legally distinct issues. Thompkins, 78 Ohio St.3d at 386. The test for sufficiency is whether the prosecution met its burden of production; manifest weight tests whether the prosecution met its burden of persuasion. Id. at 386-88. A finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. See id. at 388. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4.
 {¶ 31} Mr. Dunivant insists that he acted in self defense and that the evidence brought forth at trial demonstrates as much; so much so that the jury's contrary finding is a miscarriage of justice indicative of the jury losing its way. Self defense will justify the use of force where one can establish, by a preponderance of the evidence, that he or she was not the instigator of the altercation, acted under a reasonable belief that force was necessary to repel the imminent use of force by another, and did not violate any duty to retreat or avoid the danger. State v. Barnes
(2002), 94 Ohio St.3d 21, 24. The jury convicted Dunivant of murder, thereby implicitly rejecting his self defense claim.
 {¶ 32} At trial, the jury heard testimony from 19 witnesses. The State produced 12 witnesses, including eyewitnesses, paramedics, police officers and investigators, the victim's brother, Dunivant's friend, and a coroner and a criminalist as experts. Dunivant produced six additional witnesses and himself. Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound principal that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 33} In presenting its case for murder, the State presented a logical sequence of events, reconciled photos and locations with the corroborating testimony, played a 911 call contemporaneous to the shooting, played a tape of Dunivant's conversation with police, and highlighted omissions or inconsistencies in the defense's theory. The State produced evidence that Dunivant armed himself with a hand gun, proceeded to meet Floyd at the designated location, and shot him dead, the simplest explanation being that Dunivant owed Floyd a significant amount of money that he could not or would not repay. Dunivant never disputed that he was armed with a gun, and readily admitted as much. Dunivant explained that Floyd was a dangerous person of whom Dunivant was afraid, that due to this fear he brought a gun to their meeting, and when Floyd threatened and moved as if to strike, Dunivant shot him in self defense. Because Dunivant and Floyd were the only witnesses to the actions preceding the shooting, this was critical testimony. Based on our review of the record, we find it reasonable, and indeed likely, that the jury would have believed the testimony and evidence proffered by the State.
 {¶ 34} As Dunivant relied on an affirmative defense of self defense, both at trial and now on appeal, the critical inquiry is into the persuasiveness of his defense. Dunivant presented six other witnesses, in addition to his own testimony, which included his girlfriend, his brother, two sisters, two friends and Raymond Strain. Based on our review of the transcript, we find much of this testimony irrelevant, and that it adds little if anything to his defense. Dunivant's own testimony is largely self-serving, inconsistent, contradictory, and at points unbelievable. For example, the following occurred on cross-examination:
"[State]: You're standing outside the truck. Could you at any point walked away, run away? Nobody was holding you there, correct?
"[Dunivant]: I could have walked or ran, but it was the chance that I took, before walking or running away, he could have stabbed me or shot me in the back or — .
"[State]: How could he have stabbed you if he was [sitting] in the [driver's] seat and you were standing outside [the passenger door of] his truck and you had a gun?
"[Dunivant]: Alls he had to do was reach.
"[State]: Couldn't you just say, Ruben, stop. If he's got a knife, can't you just run away and get away from him or pull out the gun and say, Ruben, stop, put that knife away? Aren't those possibilities?
"[Dunivant]: I could have, I could have did that, but — .
"[State]: Isn't it even unreasonable to think that if he had a knife, you had to shoot him as soon as he makes a move?
"[Dunivant]: I was defending myself.
"[State]: Because you thought he had a gun, right?
"[Dunivant]: Gun or a knife or something.
"[State]: Okay.
"[Dunivant]: He was reaching [for his waist].
"[State]: And, in fact, when he reaches, he turns toward you and just simply reaches for his waist, right?
"[Dunivant]: Yes.
"* * *
"[State]: If Mr. Floyd is [sitting] in the driver's seat and he turns slightly towards you, reaches for his waist, you then begin to react, you're going to have time to unzip — lift up that pouch, unzip it, reach in, grab the gun, pull it out, raise it, point it at him, before he pulls anything out of his waist?
"[Dunivant]: Happened in a matter of seconds, yes.
"[State]: That's what happened?
"[Dunivant]: Yes.
"* * *
"[State]: Did you hear [the State's eyewitness] testify she heard a bang, then there was a pause, she looked up, saw you fire additional shots after the pause?
"[Dunivant]: Yes, I heard her testify.
"[State]: So, in fact, you shoot him and then you could have gotten away; isn't that correct?
"[Dunivant]: No. Like I said, when I pulled the gun out, I just fired.
"[State]: Once?
"[Dunivant]: It happened so fast, I just kept firing, `til the gun was empty."
 {¶ 35} Similar issues throughout the defense testimony persuade us that the jury could reasonably have found such testimony simply not credible. When first apprehended, Dunivant made no mention of Floyd reaching for any knife or gun, he said merely, "He threatened to shoot me. * * * He threatened to kill me, so I shot him." Later, the story changed: there were no verbal threats, but rather a hand motion towards his waist, which Dunivant anticipated to be a reach for a knife or gun. However, even this account was questionable, as Dunivant initially indicated that Floyd had reached with his right hand, while evidence proved that Floyd was left handed. Not only did Floyd, in fact, not have a knife or gun, Dunivant never testified that he so much as thought he saw a knife or gun.
 {¶ 36} Further, Dunivant's self defense theory rests heavily on his alleged fear of Floyd, stemming from Floyd's reputation and the threatening actions directed towards Dunivant during the weeks before the encounter. However, during that same time, Dunivant claims that he communicated openly with Floyd, loaned him his truck, and paid off any debt. Dunivant claims this deadly fear despite a seven-year business relationship, during which Floyd had never harmed or threatened him. Nothing on the day of the murder was any different than prior meetings, and yet, Dunivant armed himself out of fear for his life.
 {¶ 37} Based on our review, we must conclude that the mere fact that the jury chose to disbelieve the defense theory of the encounter, and instead chose to believe the State's version, is insufficient to find that the jury lost its way or created a manifest miscarriage of justice. See Gilliam, at 4; Otten, 33 Ohio App.3d at 340; Thompkins,78 Ohio St.3d at 387. Rather, we find it reasonable that the jury believed the State's version of the events and thereby rejected Dunivant's self defense claim. We conclude that the conviction is not against the manifest weight of the evidence, and therefore, not lacking for sufficiency either. Mr. Dunivant's fifth assignment of error is overruled.
 F. Sixth Assignment of Error
"The cumulative effect of errors during the trial resulted appellant being denied a fair trial." [sic]
 {¶ 38} Mr. Dunivant asserts that the trial court's cumulative errors created such a substantial injustice that his conviction requires reversal, even if the individual errors themselves may not rise to that level. We disagree.
 {¶ 39} Cumulative error is irrelevant without some finding of individual error. See State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, at ¶ 55. After reviewing the entire record of Dunivant's criminal trial, we find no error in the trial court's introduction or exclusion of evidence, the selection of the jury instruction, or the consideration of facts by the jury. Contrary to Dunivant's claim, the trial court presents a complete transcript setting forth sound and logical reasons for the rulings made. Mr. Dunivant's assignment of error is overruled.
 III. {¶ 40} Mr. Dunivant's assignments of error are overruled. The conviction in the Stark County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Stark, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, P.J., Whitmore, J., concur.
[1] In his brief on appeal, Dunivant has not identified particular statements from the record that he charges are hearsay. Rather, he contests the admissibility of four topics that arose at trial, over his objection, as having allegedly been expressed by Floyd to Strain: (1) that Floyd had Dunivant's truck as collateral for the debt; (2) that Floyd had taken Strain's advice and put Dunivant on a payment plan; (3) that Floyd was trying to resolve the dispute peacefully; and, (4) that Floyd had made no threats against Dunivant.
[2] The trial court considered the proffer of this proposed testimony in camera, an example of which includes:
"[FBI Agent]: I believe I have spoken with an individual who indicated, ah, that he had overheard information regarding, ah, potential threat against Mr. Dunivant. Ah, I have heard through third parties of other, of a other individual who provided the same information.
"[Dunivant's Counsel]: And this was a threat from Ruben Floyd against Craig Dunivant?
"[FBI Agent]: That's correct."
[3] This would be hearsay three or more times removed: i.e., FBI agent relating what some individual said to him (hearsay), which was a statement made elsewhere and overheard by that individual (double hearsay), which was the threatening statement by Floyd (triple hearsay). Of course, the path from Floyd to the agent need not be this direct; there could have been numerous other intermediaries in this chain of hearsay.