[Cite as *State v. Coleman*, 2025-Ohio-513.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>Plaintiff-Appellee,<br><br>- vs -<br><br>MALIKHI JERMAINE COLEMAN,<br><br>Defendant-Appellant. | CASE NO. 2024-A-0040<br><br>Criminal Appeal from the<br>Court of Common Pleas<br><br>Trial Court No. 2022 CR 00416 |

**O P I N I O N**

Decided: February 18, 2025
Judgment: Affirmed

*April R. Grabman*, Ashtabula County Prosecutor, and *Christine Davis*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Russell S. Bensing*, 600 IMG Building, 1360 East Ninth Street, Cleveland, OH 44114 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1}  Appellant, Malikhi Jermaine Coleman, appeals the judgment of the Ashtabula County Court of Common Pleas, convicting him, after a trial by jury, of Murder, Discharge of a Firearm on or near Prohibited Premises, and Improperly handling a Firearm in a Motor Vehicle; the first two counts carried one-, three-, and five-year firearm specifications.  At issue is whether the trial court committed prejudicial error in allowing the prosecutor to introduce evidence of prior acts and whether the trial court committed plain error in its self-defense jury instruction. We affirm.

{¶2}    On the evening of July 26, 2022, two groups of young men convened at the Harbor Ridge Apartment Complex in Ashtabula, Ohio. One group, the victim's group, consisted of, among others, Frederick Johnson ("the victim"), Ra'Mon McRae, Raburn Seawood, Donte Holley (a minor), and Brian Smith.  The other group, Coleman's group, included Coleman, Julius Simmons, and three other individuals who were not directly involved in the incident. There were three notable vehicles involved: a gold Suzuki, driven by Seawood; a gray Chevy Malibu, driven by the victim; and a white Mercury Grand Marquis, driven by Simmons.

{¶3}    Upon arrival at the apartment complex, the victim's group gathered in the parking lot; they were talking and considering putting on boxing gloves and participating light boxing. Apparently, Coleman's group observed the victim's group and, according to Seawood, Coleman announced,"We got guns over here."

{¶4}    Seawood admitted he had a Glock 17 9mm handgun, with a 50-round drum on his person. He stated, however, he and other members of the victim's group went inside one of the apartments to play and/or compose music for a period of time.  The victim's group left the apartment and, according to Seawood, Coleman began flashing an AK 47 rifle and exclaiming apparent gang slurs; specifically, at the time, Seawood and the victim were members of the "Black Disciples" gang and Coleman was yelling "BDK" which, according to Seawood, stood for "Black Disciple Killers."

{¶5}    Seawood asserted he and the victim concluded they would return to the former's residence "to avoid the drama" of Coleman's group. Seawood, Smith, and Holley entered Seawood's Suzuki; the victim and another individual, whose name was not clearly established, entered the victim's Malibu.  Both cars exited the apartment complex onto

2

Lambros Avenue. Simmons and Coleman entered the Grand Marquis and followed the members of the victim's group.

{¶6} Seawood's vehicle turned right onto Ohio Avenue with the victim's vehicle following. According to Seawood, shots were fired, and he noticed the victim had stopped his car on Ohio Avenue and exited the vehicle. At the same time, Holley was positioned in Seawood's back seat wielding a firearm out an open window. Seawood stated he did not observe the victim armed on the day of the incident and, as far as Seawood could observe, the victim had no firearm brandished as he exited the vehicle. The victim then fell to the ground, suffering one fatal gunshot wound to the face. Although Seawood acknowledged that Holley fired multiple shots from his car, Seawood identified Coleman as the individual who shot the victim. Seawood stated, however, he had no idea whether Coleman or Holley fired first.

{¶7} McRae, who was with the victim's group, was initially in Seawood's Suzuki when the vehicles left the apartment complex. The vehicles stopped and McRae exited the Suzuki and entered the victim's Malibu. The victim followed Seawood's car onto Ohio Avenue and then stopped. According to McRea, the victim exited his car and shooting commenced. When the shooting began, McRae stated he ducked down inside the victim's vehicle; after it ceased, he exited the vehicle and ran away.

{¶8} Smith, another member of the victim's group, was in the front passenger seat of Seawood's vehicle. Smith stated that Holley was in the back passenger's seat, and he was leaning on the car's window sill with a firearm. Once the vehicle turned onto Ohio Avenue, Smith noticed Simmons' Grand Marquis and multiple gun shots were fired.

3

Smith claimed that he "heard the louder repeated firing first" and Holley followed by shooting at the Grand Marquis. Smith could not identify the shooter in the Grand Marquis.

{¶9} Simmons, a member of Coleman's group, went with Coleman on the date of the incident to the Harbor Ridge Apartment complex in Simmons' Grand Marquis. Apparently, Simmons had relatives living at the complex. Simmons was aware that Coleman had an AK 47 rifle with him.

{¶10} According to Simmons, Coleman and others were consorting near a picnic table when he noticed members of the victim's group flashing guns. In response, Simmons stated Coleman began rapping along with a song with lyrics that included "BDK," i.e., Black Disciple Killers. Simmons was aware that at least Seawood was a member of the Black Disciples. Coleman subsequently retrieved the AK 47 from Simmons' car and placed it on the picnic table. Simmons indicated that both Seawood and Coleman flashed their relative weapons at each other; regardless of the witnesses' relative observations, it is clear that both groups were well armed.

{¶11} Simmons stated he and Coleman became uncomfortable and returned to the Grand Marquis intending to leave. The victim's group apparently entered their respective vehicles and, according to Simmons, he "looped around the parking lot and gave them time to leave . . . ." Once Simmons and Coleman exited, Simmons observed Holley in Seawood's vehicle "hanging out the window, flashing it, pointing a gun at us." According to Simmons, Seawood stopped his vehicle in the middle of the street. Simmons advised Coleman, who was holding the AK 47, not to shoot from the vehicle. At that point, shots "just started going off." Simmons stated he did not know who shot first, but all he could hear was Coleman's rifle being fired.

4

{¶12} Coleman's rendition of events substantially tracked Simmons' version. According to Coleman, however, the victim had pointed a firearm at him before he retrieved the AK 47. Coleman did not deny possessing or owning the rifle, but explained he carried the firearm for self-protection because he had been shot previously. As he and Simmons left the apartment complex, Coleman noticed Holley hanging out of Seawood's vehicle with a firearm; Coleman also claimed he observed the victim exiting his car in possession of a firearm. According to Coleman, someone from the victim's group began shooting at him. In response, Coleman fired his rifle, discharging approximately 14 or 15 rounds.

{¶13} Once the shooting ceased, the victim was the only individual hit. He was killed by a single gunshot wound to the side of the face. According to the autopsy, the bullet entered the left side of the victim's cheek area, caused various fractures of the skull, and entered the brain. The bullet did not exit the victim's skull, but the significant damage was sufficient to cause his death.

{¶14} Detective Wayne Howell of the Ashtabula City Police Department arrived on the scene and observed the victim in the roadway. Blood was spurting from a wound on the left side of his cheek. Blood was also visible in the victim's left ear. The victim was unconscious, his tongue was swollen, and blood was pooling around his eye sockets and near the nostrils. Detective Howell found no pulse and observed the victim was not breathing. Other officers arrived at the scene and secured the same.

{¶15} Detective Wesley Burns of the Ashtabula City Police Department arrived and assisted other officers in collecting evidence. The detective found two 9 mm rounds near the victim's vehicle and two more where Seawood's Suzuki was situated at the time

5

of the incident. Detective Burns also found multiple 7.62 X 39-mm caliber-rifle casings at the north of the intersection of Lambros Lane and Ohio Avenue.

{¶16} Lieutenant Michael Palinkas of the Ashtabula City Police Department received a call shortly after the incident informing him that a sheriff's deputy had stopped the Grand Marquis. Simmons and Coleman were brought to the police station where Lieutenant Palinkas interviewed them. Simmons initially denied any knowledge of the incident but later stated that someone from the other vehicle fired first. Coleman eventually admitted he fired shots from the passenger window of the vehicle. Lieutenant Palinkas, after analyzing the evidence, also concluded the victim did not exchange in the crossfire.

{¶17} Evidence from the scene was sent to the Ohio Bureau of Criminal Investigation ("BCI"). Alex Miller, a forensic scientist for BCI, performed scientific testing on Coleman's AK 47. Mr. Miller determined the rifle was operable and compared shell casings from the test firing of the rifle and those found at the scene. He concluded, based upon individual characteristics, all the submitted shell casings were fired from Coleman's AK 47.

{¶18} Miller observed that the firing pin of the subject AK 47 left "divots" or specific, individual characteristics on the primer; moreover, he stated that when the gun powder is burning, it produces a large amount of gas pressure. When the bullet is driven out of the barrel, the cartridge case stamps up against the breach face or bolt face of the firearm. These markings were also individual characteristics upon which Miller based his conclusion that the casings found at the scene were fired from Coleman's rifle.

6

{¶19} The bullet recovered from the victim's head was too badly damaged for Miller to conclusively determine it was fired from Coleman's AK 47. He was able to opine, however, that based upon individual rifling characteristics found in the rifle's barrel, Miller determined the bullet probably was shot from Coleman's AK 47. Ultimately, however, Coleman conceded the fatal shot was fired from his rifle.

{¶20} In September 2022, Coleman was charged in a four-count indictment. Count One alleged Murder, in violation of R.C. 2903.02(B) and (D), an unclassified felony. Count One additionally carried a three-year firearm specification, pursuant to R.C. 2941.145(A), and a five-year firearm specification, pursuant to R.C. 2941.146(A). Count Two alleged Felonious Assault, in violation of R.C. 2903.11(A)(2) and (D)(1)(a), a felony of the second degree. Count Two also carried a three-year firearm specification, pursuant to R.C. 2941.145(A), and a five-year firearm specification, pursuant to R.C. 2941.146(A). Count Three alleged Discharge of a Firearm on or Near Prohibited Premises, in violation of R.C. 2923.162(A)(3) and (C)(4), a felony of the first degree. Count Three also carried a three-year firearm specification, pursuant to R.C. 2941.145(A), and a five-year firearm specification, pursuant to R.C. 2941.146(A). And Count Four alleged Improper Handling of a Firearm in a Motor Vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree.

{¶21} The matter proceeded to jury trial, after which the jury returned a verdict of guilty on all counts. At sentencing, the trial court merged the Felonious Assault and the Murder counts and the State elected to proceed to sentencing on the Murder count. On the Murder count, Coleman was sentenced to a minimum of 15 years to life imprisonment and five years on the firearm specification. The term on the specification will be served

7

first and consecutive to the Murder sentence for a total, minimum of 20 years. On Count Three, Coleman was sentenced to a minimum of 11 years with a maximum, indefinite term of 16.5 years incarceration along with five years on the firearm specification. The firearm specification will be served first and consecutive to the Discharge of a Firearm charge, for a total, minimum term of 16 to 21.5 years. And further Coleman was sentenced to 18 months on the Improper Handling count. The prison terms were ordered to be served consecutively to one another, for a total minimum term of 37.5 years to 43-years in prison and a maximum of life in prison.

{¶22} This appeal follows. Appellant assigns two errors for this court's review. He first alleges:

{¶23} "The trial court erred in allowing the prosecutor to introduce evidence of prior acts of the Defendant, in derogation of Defendant's right to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution."

{¶24} A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *State v. Finnerty*, 45 Ohio St.3d 104, 109 (1989). No court has the discretionary authority to commit an error of law. *State v. Beechler*, 2010-Ohio-1900, ¶ 70 (2d Dist.) An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *Beechler* at ¶ 62, quoting *Black's Law Dictionary* (8th Ed. 2004).

{¶25} Coleman's assignment of error is premised upon the prosecutor's cross-examination.

{¶26} During Coleman's direct examination, the following exchange took place:

8

Q. Okay. After you retrieved the firearm from your vehicle, how long were you sitting there before you decided to leave?

A. Um, five, ten minutes, maybe.

Q. Okay. What made you decide to leave?

A. They were flashing their guns, and I didn't want to be a part of that. I didn't - -

Q. Why? Please explain.

A. Because I have, um, already been shot before, and I didn't want to get shot again.

Q. When were you shot before?

A. A year prior to this situation.

. . .

Q. Okay. How did that affect you?

A. Um, it gave me a couple stress disorders. You know, I didn't want to go nowhere without a gun. I was scared. Every time I left the house, I - - well, I didn't really leave the house much, but every time I left the house, I made sure I had a firearm with me
.

{¶27} On cross-examination, the prosecutor engaged in the following exchange

with Coleman:

Q. Okay. You talked about being shot before, right?

A. Yes, ma'am.

Q. And that no one was charged (with Coleman being shot)?

A. Yes, ma'am.

Q. Didn't that case go to trial as well?

A. Yes ma'am.

9

Case No. 2024-A-0040

Q. And weren't you in one of the cars that drove up on a house
and shot and hit Nancy Rhodes - -

{¶28} Defense counsel immediately objected but the court overruled the objection, observing "[t]he only reason I'm going to allow this question to be asked is because you went there, [defense counsel]. . . . Otherwise, I would not have allowed anyone to ask these questions."

{¶29} The questioning about the previous incident continued:

Q. Didn't you drive up with a couple cars to Nancy Rhodes'
house and start shooting at the house?

A. No ma'am.

Q. You and Ivan Grover and a bunch of other individuals drove
up on Nancy Rhodes' house containing her grandson and
shot at the house, and he shot back, correct?

. . .

A. No. He shot me three times before anybody shot back.

. . .

Q. Okay. Where you and Ivan Grover and a bunch of other
individuals drive up on a house and open fire; isn't that right?
(sic)

A. No. You don't see nobody driving up or anything.

Q. You were there, weren't you?

A. Yes, ma'am. I was in the passenger's seat.

Q. And you got shot, right?

A. Yes, ma'am.

{¶30} Coleman argues there is no question that had the subject not been raised on direct examination, the prosecutor's line of questioning would have been inadmissible.

10

Case No. 2024-A-0040

He points out that the evidence would not have come under any of the exceptions set forth in Evid.R. 404(B). Indeed, Coleman claims the prosecutor's cross elicited the essence of propensity evidence. To wit: Coleman was involved in a prior drive-by shooting and, thus, it is more likely he committed the drive-by shooting leading to the murder in this case.

{¶31} In *State v. Dunivant*, 2005-Ohio-1497, ¶ 12 (9th Dist.), the Ninth District Court of Appeals, sitting by assignment for the Fifth District Court of Appeals, held: "'Under . . . the "opening the door" doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.'" *Id*., quoting United *States v. Whitworth,* 856 F.2d 1268, 1285 (9th Cir. 1988). *See also United States v. Moody*, 371 F.2d 688, 693 (6th Cir. 1967). "The doctrine does not permit the introduction of evidence that is related to a different issue or is irrelevant to the evidence previously admitted." *Whitworth*, citing McCormick on Evidence § 57 (3d Ed. 1984).

{¶32} As noted, the doctrine's purpose is to *rebut* false impressions. "Rebuttal evidence, the scope of which lies within the discretion of the trial court, is that which is 'given to explain, refute, or disprove new facts introduced into evidence by the adverse party.'" *State v. Essa,* 2011-Ohio-2513, ¶ 97 (8th Dist.), quoting *State v. McNeill,* 83 Ohio St.3d 438, 446, 1998-Ohio-293. Nevertheless, the doctrine of opening the door must be exercised with caution. In quoting a Federal District Court trial judge, the Circuit Court for the District of Columbia, highlighted the doctrine's pitfalls: "'This business about "opening the door" is a much overused issue and it carries with it an oversimplification. Opening

11

the door is one thing. But what comes through the door is another. Everything cannot come through the door.'" *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971).

{¶33} The *Winston* court continued:

> The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.' *California Ins. Co. v. Allen*, 235 F.2d 178, 180 (5th Cir. 1956).

*Winston* at 1240.

{¶34} Other courts outside of Ohio's jurisdiction have also commented on these points. Courts have observed that opening the door is a doctrine intended to serve fairness and truth-seeking, not create impermissible inferences. *See, e.g., Ramirez v. State*, 739 So.2d 568, 579 (Fla. 1999) ("The concept of 'opening the door' is 'based on considerations of fairness and the truth-seeking function of a trial.'" (quoting *Bozeman v. State,* 698 So.2d 629, 631 (Fla.App. 1997))). The otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that which is necessary to correct a misleading advantage created by the evidence that opened the door. *See, e.g., State v. Gaudet*, 97 A.3d 640, 646 (N.H. 2014) (recognizing that the opening the door doctrine applies "to situations in which one party has introduced admissible evidence that creates a misleading advantage and the opponent is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage" (citing *State v. Wamala,* 972 A.2d 1071, 1076 (N.H. 2009))).

{¶35} More specifically:

> For this doctrine to apply, a party must introduce evidence that provides a justification, beyond mere relevance, for the

12

opponent's introduction of evidence that may not otherwise be admissible. However, the initial evidence must have reasonably misled the fact finder in some way. The rule, thus, prevents a party from successfully excluding evidence favorable to his opponent and then selectively introducing some of this evidence for his own advantage, without allowing the opponent to place the evidence in proper context. The fact that the "door has been opened" does not permit all evidence to pass through because the doctrine is intended to prevent prejudice and is not to be subverted into a rule for the injection of prejudice. The trial court is in the best position to gauge the prejudicial impact of particular testimony.

(Citations and internal quotation marks omitted.) *Gaudet*, citing and quoting *Wamala* at 1076-77,

{¶36} As also recognized by the Connecticut Court of Appeals,

The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal.

*State v. Phillips*, 927 A.2d 931, 943 (Conn. 2007) (quoting *State v. Graham*, 509 A.2d 493, 496 (Conn. 1986)).

{¶37} In light of these points, courts, including those in Ohio, have noted the "the doctrine [of opening the door] is 'dangerously prone to overuse.'" *State v. Bronner*, 2002-Ohio-4248, ¶ 72 (9th Dist.), quoting *Winston*, 447 F.2d at 1240, quoting *United States v. McClain*, 440 F.2d 241, 244 (D.C. Cir.1971); *see also State v. McDaniel,* 2021-Ohio-724, ¶ 13 (1st Dist.). Because it is a principle of "expanded relevancy," it stands to reason that courts must be circumspect in utilizing the doctrine.

Case No. 2024-A-0040

**{¶38}** "Evid.R. 404(B) exists to guard against the 'propensity' inference—in other words, wielding past bad acts to prove action in conformity therewith, which facilitates a conviction based on prior conduct rather than the evidence at hand." *State v. O'Connell*, 2020-Ohio-1369, ¶ 1 (1st Dist.). "The introduction of evidence of other bad acts can be prejudicial and is generally prohibited by Evid.R. 404(B)." *State v. Moore,* 2003-Ohio-1154, ¶ 23 (8th Dist.), citing *State v. Curry*, 43 Ohio St.2d 66, 68-69 (1975). Still, courts will not find prejudicial error when the defense properly "opens the door" to such evidence. *Moore* at ¶ 23, citing *State v. Greer*, 39 Ohio St.3d 236, 243 (1988).

**{¶39}** The primary question, consequently, is whether the trial court properly ruled that defense counsel opened the door for the prosecutor's exploration of the alleged bad acts. Coleman argues the query must be answered in the negative, while the State maintains the admission was proper.

**{¶40}** In this case, Coleman introduced evidence that he had been shot previously as a foundation for carrying the rifle for protection as well as his heightened concern for situations in which others are carrying firearms. It is not clear how the State's cross-examination, implicating Coleman as a participant in a drive-by shooting, served to rebut (i.e., explain, refute, or disprove) the facts introduced on Coleman's direct examination.

**{¶41}** Coleman's testimony on direct simply provided an explanation regarding why he was carrying the rifle and also why, if he was believed, he intended on leaving without facilitating an encounter or exacerbating the situation further. We fail to see how the State was unfairly prejudiced by Coleman's testimony such that the State should have been permitted to explore the specific nuances of the prior incident, which directly implicated him in a separate drive-by shooting.

14

**{¶42}** Put differently, defense counsel's line of inquiry in direct did *not* open the door for an exchange about or a full exploration of the circumstances of the previous incident. The prosecutor's questions about Coleman's alleged participation in a prior drive-by were not necessary to address the testimony elicited from Coleman during cross-examination. In our view, consequently, the prosecutor's cross-examination injected improper propensity evidence of Coleman's prior actions that was ultimately irrelevant to any fact of consequence in this case. We therefore conclude the trial court abused its discretion in allowing the prosecutor to pursue the line of questioning.

**{¶43}** Our analysis, however, does not end with this conclusion. We must determine whether the error was harmless. In *State v. Kennedy*, 2022-Ohio-3369, ¶ 27 (11th Dist.), this court observed:

**{¶44}** Crim.R. 52(A) defines harmless error in the context of criminal cases and provides:

> Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. During a harmless-error inquiry, the state has the burden of proving that the error did not affect the substantial rights of the defendant.

*Kennedy* at ¶ 27, citing *State v. Perry*, 2004-Ohio-297, ¶ 15.

**{¶45}** In *State v. Morris*, 2014-Ohio-5052, ¶ 23, the Supreme Court of Ohio discussed harmless error:

> [I]f there is "a '[d]eviation from a legal rule,'" courts undertake a "'harmless error' inquiry—to determine whether the error 'affect[ed] substantial rights' of the criminal defendant." *State v. Fisher,* [2003-Ohio-2761, ¶ 7], quoting *United States v. Olano,* [507 U.S. 725, 732-733, 734] (1993). The term "substantial rights" has been interpreted to require that "'the error must have been *prejudicial.*' (Emphasis added.)" *Id.,* quoting *Olano* at 734[.] If a court determines that

15

the error did not affect the defendant's substantial rights, then the error is harmless and "'shall be discarded.'" *Id.,* quoting Crim.R. 52(A).

**{¶46}** ""'[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.'"" *Morris* at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166 (1983), fn. 5.

**{¶47}** When reviewing the remaining evidence, the reviewing court's role "'is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury.'" *Morris* at ¶ 29, quoting *Rahman* at 151, fn. 4.

**{¶48}** At trial, testimony reflected that while both groups were at the apartment complex, Coleman produced his AK 47 and displayed it for the victim's group to see. According to Seawood, while he and others in the victim's group were "playing around," possibly boxing with one another, Coleman announced, "We got guns over here." Coleman subsequently flashed the AK 47 and began shouting "gang slurs" toward the victim's group; in particular, he yelled "BDK" (Black Disciple Killers) three or four times.

**{¶49}** After Seawood left the apartment with Smith and Holley, he testified, "we stopped 'cause we seen him, or whoever was driving (the other vehicle with Coleman in the passenger seat), ah, after they made the loop and they seen we had made the right, they come zooming down Lambros Lane, and shots started firing off." Seawood testified he did not know who fired first, but he observed Coleman shooting the rifle.

**{¶50}** Simmons, who was with Coleman, heard Coleman rapping to a song that repeated the phrase "BDK." Simmons testified, after watching a video from the apartment complex security system, he saw Coleman flashing the AK 47 at the victim's group. Once

16

Simmons left the complex with Coleman, he testified Coleman brandished the rifle at which point Simmons advised him not to shoot from his car. Simmons testified he did not know who shot first, but he did not hear any other gunfire before Coleman commenced shooting.

{¶51} Smith, who was riding with Seawood and Holley, stated Holley shot at Coleman, but only after Coleman shot first. He testified Coleman's rifle was louder than the other shots and stated the louder shots rang out prior to Holley firing. Smith acknowledged he originally told police he did not know who fired first, but maintained his certainty at trial that he heard the louder shots first.

{¶52} Brent Loveland testified on Coleman's behalf and stated he overheard gunfire from the apartment complex. He stated he first heard pistol rounds, then the rifle. Coleman testified he retrieved his AK 47 only because he observed members of the victim's group flashing firearms. Moreover, Coleman testified he shot at the victim's group in self-defense because someone shot at him and Simmons first.

{¶53} Although Coleman testified the victim's group taunted his group and were the aggressors, other testimony suggested otherwise. The testimony of both Simmons and Smith, although subject to the factfinder's evaluation, indicated Coleman initiated the confrontation as well as the gun fight. The harmless-error analysis requires the error to affect a substantial right, i.e., unfair prejudice. While we conclude the introduction of the evidence of Coleman's previous participation in a drive-by was highly problematic and defense counsel's objection should have been sustained, we also maintain the remaining evidence adduced by the prosecution was sufficient to overcome any unfair prejudice. Moreover, despite the problematic character of the propensity evidence introduced by the

17

prosecutor, the jury was made aware that Coleman was acquitted of any criminal wrongdoing in the previous case. We therefore conclude the error in introducing Coleman's prior actions may be discarded and the error is accordingly deemed harmless.

{¶54} Coleman's first assignment of error lacks merit.

{¶55} Coleman's second assignment of error provides:

{¶56} "The trial court committed plain error in instructing the jury that the defendant had a duty to retreat."

{¶57} Appellant was convicted of murder, which required the State to prove, beyond a reasonable doubt, that Coleman caused the death of the victim as a proximate result of Coleman's committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: felonious assault. *See* R.C. 2903.02(B) and (D). Under R.C. 2901.05(B)(1), an individual is allowed to act in self-defense "[i]f, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . (and) the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self defense. . ." R.C. 2901.05 "places the burden of persuasion upon the State to disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Corey*, 2022-Ohio-4568, ¶ 104 (11th Dist.)

{¶58} While instructing the jury, the trial court stated:

> To prove that the Defendant's use of deadly force was not in self-defense the State must prove beyond a reasonable doubt at least one of the following: The Defendant was at fault in creating the situation giving rise to the shooting; or the Defendant did not have reasonable grounds to believe he was in immediate danger of death or great bodily harm; or the

18

Defendant did not have an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm; *or the Defendant violated a duty to retreat to avoid the danger*; or the Defendant used unreasonable force.

(Emphasis added.)

{¶59} The trial court subsequently instructed:

The Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant was at fault in creating the situation that resulted in the death. The Defendant was at fault if the Defendant was the initial aggressor and (the victim) did not escalate the situation by being the first to use or attempt to use deadly force; or the Defendant provoked (the victim) into using force; or the Defendant did not withdraw from the situation; or the Defendant withdrew from the situation but did not inform (the victim) or reasonably indicate by words or acts to (the victim) of his withdrawal.

{¶60} Coleman accurately points out that Ohio adopted a "stand-your-ground" policy when it amended R.C. 2901.09, effective April 6, 2021 – over a year prior to the incident. The amended version provides, in relevant part:

(B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.

(C) A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety.

{¶61} Coleman argues that the trial court's instruction, particularly the first quoted instruction, was tantamount to advising the jury that he had a duty to retreat.

{¶62} We initially point out that the second quoted instruction does not necessarily imply Coleman had a duty to retreat. Rather, it suggests that if Coleman was at fault and

19

Case No. 2024-A-0040

he did not withdraw from the affray or Coleman withdrew, but did not inform the victim or reasonably indicate by words or actions to the victim of his withdrawal, then he did not act in self-defense. We consequently do not read this component of the instructions as improperly stating the law.

{¶63} Additionally, and reinforcing this point, the trial court instructed the jury: "In determining whether the Defendant, in using force in self-defense, reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety, *you may not consider the possibility of retreat by the Defendant. The Defendant had no duty to retreat from before using force in self-defense if the Defendant was in a place in which he lawfully had a right to be.*" (Emphasis added.)

{¶64} With respect to the first quoted instruction, we recognize there is room for confusion regarding whether Coleman had a duty to retreat. Although that issue was later clarified in the jury instructions, the first instruction may appear to conflict with the more succinct subsequent instructions. Nevertheless, neither counsel for the State nor defense counsel objected to the instructions prior to their issuance, even when the court overtly asked if there were "any objections, additions, or corrections at this time."

{¶65} Moreover, the State did not present an argument that Coleman could not claim self-defense because he had no right or privilege to be present at the location where the incident took place. As such, there was no evidence or argument before the jury that, due to special circumstances, he violated some unique or specific duty to withdraw or retreat. In this regard, we fail to see how the first quoted instruction posed the risk of confusing or misleading the jury such that plain error must be noticed. *See State v. Carter*, 2024-Ohio-1908, ¶ 19-22 (2d Dist.) (holding the same instruction was not reversible error

20

where there was no evidence presented by the prosecution that the defendant asserting self-defense violated some overarching or case-specific duty to retreat).

{¶66} Reading the jury instructions together and as a whole, we therefore conclude that, even if the aggrieved instruction was issued in error, it did not affect the outcome of the proceeding. We conclude there was no plain error.

{¶67} Coleman's second assignment of error lacks merit.

{¶68} The judgment of the Ashtabula County Court of Common Pleas is affirmed.

ROBERT J. PATTON, P.J.,

JOHN J. EKLUND, J.,

concur.